UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

In re:                                                    Chapter 11 Cases

CONSOLIDATED BURGER HOLDINGS,
LLC,                                                      Case No. 25-40162-KKS
CONSOLIDATED BURGER A, LLC, AND                           Case No. 25-40160-KKS
CONSOLIDATED BURGER B, LLC,                               Case No. 25-40161-KKS

      Debtors.                                       Jointly Administered Under
                                                          Case No. 25-40162-KKS

_____/

### DECLARATION OF JOSEPH J. LUZINSKI IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Joseph J. Luzinski, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am the Chief Restructuring Officer (the "CRO") of Consolidated Burger Holdings, LLC ("Consolidated Holdings"), Consolidated Burger A, LLC ("Consolidated A"), and Consolidated Burger B, LLC ("Consolidated B", and together with Consolidated Holdings and Consolidated A, collectively, the "Debtors" or the "Company"), having been appointed on March 11, 2025.  I continue to serve as CRO for the Debtors, as debtors and debtors-in-possession, in the above-captioned chapter 11 cases (each, a "Chapter 11 Case", and collectively, the "Chapter 11 Cases").

2.      I am a Senior Managing Director with Development Specialists, Inc. ("DSI"). DSI and its professionals are highly qualified and experienced in providing restructuring management and advisory services, including in the areas of insolvency, bankruptcy, reorganization, and corporate restructuring.  For more than four decades, DSI has been providing well-respected restructuring management and advisory services, including corporate finance,

turnaround consulting, forensic accounting, litigation support to distressed, insolvent, and reorganizing businesses, and supplying senior executives on an interim basis to financially troubled companies. DSI has specific and extensive experience in numerous and diverse sectors and its core competencies include providing management services and advising debtors in chapter 11 cases. DSI maintains offices in various location in the United States, including Fort Lauderdale and New York, which are my two principal offices.

3.    As a Senior Managing Director with DSI, I have advised and operated companies across a variety of industries and have served in various executive and fiduciary roles in numerous restructurings and bankruptcies. I have more than 37 years of experience in chapter 11 cases and in providing restructuring management services. My recent restructuring and bankruptcy experience includes serving as: (i) CRO to a merchant cash advance company in a chapter 11 case; (ii) CRO of a provider of hearing services and hearing aids in a chapter 11 case; (iii) the chapter 11 trustee to a pair of automotive dealerships; (iv) the chapter 7 trustee to a numismatic collector coin company; (v) advisor to the chapter 11 trustee to a Peruvian fishing company; (vi) CRO in a chapter 11 case to a law firm; (vii) the chapter 11 trustee for a shopping mall in Texas; (viii) the CRO to a bank holding company in a chapter 11 proceedings; and (ix) the liquidating trustee for one of the largest inpatient and outpatient behavioral healthcare services in the substance use disorder, addiction, and mental health treatment space in the United States.

4.    On or about March 11, 2025, the Debtors retained DSI to provide the services of myself as CRO of the Debtors and additional staff to assist me in my role as CRO. Since the Debtors' retention of DSI and my appointment as CRO, I and other colleagues from DSI that provide services for the Debtors have become familiar with the Debtors' businesses, financial

2

affairs, debt structure, assets, contractual arrangements, operations, and strategic challenges.  I and other colleagues at DSI have been assisting the Debtors with respect to managing liquidity, seeking additional capital, and analyzing potential strategic alternatives for the Debtors. Accordingly, I and other colleagues at DSI have acquired substantial background and information regarding the Debtors that will assist DSI in providing effective and efficient services to the Debtors with the many issues that may arise in the context of these Chapter 11 Cases.

5.     On the date hereof (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Florida (the "Court").  The Debtors are operating their business and managing their affairs as debtors-in-possession.  To date, no creditors' committee has been appointed in the Chapter 11 Cases by the Office of the United States Trustee for the Northern District of Florida (the "United States Trustee").  No trustee or examiner has been appointed in the Chapter 11 Cases.  The principal purpose of these Chapter 11 Cases is for the Debtors to sell substantially all of their assets through a court-supervised sale process.

6.     To minimize any adverse effects on their estates as a result of the commencement of these Chapter 11 Cases, the Debtors have filed certain motions, applications and other papers seeking various types of "first day" relief (including all attachments and exhibits, amendments and proposed orders thereto, collectively, the "First Day Filings").[1]  The First Day Filings seek relief aimed, among other things, to establish the foundation for the smooth and efficient entry into chapter 11 and the administration of these Chapter 11 Cases.  Gaining and maintaining the

---

[1]  Capitalized terms used by not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Filing(s).

support of the Debtors' employees, vendors, customers, and other key constituents, as well as maintaining the day-to-day operations of the Debtors' businesses with minimal disruption, will be critical to the Debtors' efforts in chapter 11 and their ability to preserve and maximize the value of their estates.  The relief requested in the First Filings is in the best interests of the Debtors, their estates, and their creditors, and is necessary to avoid immediate and irreparable harm

7.      I submit this declaration ("Declaration") to assist the Court and other parties-in-interest in understanding the Debtors, their business, and the Chapter 11 Cases, as well as to support the Debtors' petitions and the First Day Filings.  Except as otherwise indicated, I have personal knowledge of the matters set forth in this Declaration, and all statements and facts set forth herein are based upon my personal knowledge, discussions with the Debtors' senior management and the Debtors' professionals, including my colleagues at DSI, my and our team's review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' professionals, or my opinion based upon my experience, knowledge, and information regarding the Debtors' operations and financial condition.  In making my statements based upon my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' professionals and representatives, I have relied upon those professionals and representatives accurately recording, preparing or collecting such documentation and other information.

8.      I am authorized to submit this Declaration on behalf of the Debtors.  I am over the age of eighteen, and if called to testify as a witness in this matter, I could and would competently testify to each of the statements and facts set forth herein.

13616979-22

9.      This Declaration is divided into three parts.  **Part I** provides background information about the Debtors, including their past and current business operations, their corporate and capital structure, and the circumstances leading up to the filing of these Chapter 11 Cases.  **Part II** summarizes the Debtors' primary objectives in these Chapter 11 Cases.  **Part III** lists, among other things, the primary First Day Filings and incorporates herein by reference the facts set forth sets forth in such First Day Filings to create the evidentiary basis for the relief sought in each of the First Day Filings.

**PART I**
**BACKGROUND**

**A.      OVERVIEW OF THE DEBTORS' BUSINESS OPERATIONS.**

10.      Founded in 1954, the Burger King® brand is the second largest fast food hamburger chain in the world.  The Debtors constitute one of the largest franchisees of Burger King® restaurants.  The Debtors strive to serve great food with the best people: one person, one meal, and one community at a time.  The Debtors are also a top-tier Burger King® franchisee, consistently receiving the highest marks based upon Burger King® score metrics.



11.      As of the Petition Date, the Debtors operate their Burger King® restaurants out of 57 locations (each, a "Restaurant", and collectively, the "Restaurants") in attractive markets

13616979-22

located in Florida and Southern Georgia.  The Restaurants are informally organized into three geographical groups, including (i) Tallahassee and Southern Georgia (18 Restaurants), (ii) South Florida (19 Restaurants), and (iii) the Florida panhandle (20 Restaurants).  The city with the single highest number of the Restaurants is Tallahassee, Florida, with nine locations.  Other locations where the Debtors operate their Restaurants include, among numerous others, Havana (FL), Quincy (FL), Valdosta (GA), West Palm Beach (FL), Naples (FL), and Panama City (FL). The Debtors operate both 53 traditional, stand-alone Restaurants and four Restaurants which are located in Walmart® retail stores.  Of the total 57 Restaurants as of the Petition Date, 39 are operated under Consolidated A and 18 are operated under Consolidated B.



12.    Since their acquisition by the current owners in 2018, the Debtors have spent millions of dollars on upgrades, improvements and extensive remodeling of a number of the Restaurants in order to maintain and improve the Debtors' attractive Burger King® platform.  In addition to accomplishing complete remodels at certain locations, the Debtors' Restaurant improvement plan has resulted in, among other upgrades, new HVAC systems, roofs, parking lot

upgrades, and lot lighting upgrades at various Restaurants. The Debtors' management is also planning additional complete remodels, upgrades and improvements at the Restaurants over the next few years.

**B.      CORPORATE ORGANIZATION**

      **a.      <u>Corporate Structure and Governance</u>**

      13.      An organizational chart illustrating the Debtors' corporate structure as of the Petition Date is attached hereto as **<u>Exhibit A</u>**.

      14.      The Debtors are limited liability companies formed under the laws of the State of Delaware. Non-debtor Parent Consolidated Burger Holdings, LLC ("<u>Parent Consolidated Holdings</u>") is the immediate parent entity of Consolidated Holdings. Parent Consolidated Holdings holds 100% of the equity interests in Consolidated Holdings.

      15.      Debtor Consolidated Holdings is the sole member of, and owns 100% of the equity interests in, both Consolidated A and Consolidated B.

      **b.      <u>Franchise Agreements and Leases</u>**

      16.      Each of the Restaurants is subject to its own *Burger King Restaurant Franchise Agreement*, by and between either the Burger King Corporation ("<u>BKC</u>") or the Burger King Company ("<u>BKCo</u>") and the applicable Debtor (each, a "<u>Franchise Agreement</u>", and collectively, the "<u>Franchise Agreements</u>"). Pursuant to the Franchise Agreements, the Debtors are granted the right to operate the Restaurants using the Burger King® trademarks and service marks, and are provided certain operational support from BKC, in exchange for payment of certain royalties and advertising contributions to BKC in accordance with and subject to the terms and conditions of the Franchise Agreements. Consolidated Holdings, and/or non-debtors Parent Consolidated

Holdings and/or Lee M. Baugher provided guarantees of certain of the Debtors' obligations under approximately half of the Franchise Agreements.

17.     Each of the Restaurants is also subject to its own lease agreement (each, a "<u>Lease Agreement</u>" and collectively, the "<u>Lease Agreements</u>") by and between the applicable Debtor and the lessor of the property on which the Restaurant is located.  Consolidated Holdings, and/or non-debtors Parent Consolidated Holdings and/or Lee M. Baugher provided guarantees of the Debtors' obligations under approximately half of the Lease Agreements.

**c.     Settlement with Burger King Company**

18.     On January 16, 2024, BKCo filed a complaint against the Debtors and other parties in the United States District Court for the Southern District of Florida (the "<u>District Court</u>") styled, *Burger King Company, LLC* v. *Consolidated Burger Holdings, LLC, Consolidated Burger A, LLC, Consolidated Burger B, LLC, Parent Consolidated Burger, LLC and Lee Baugher* (Case No. 24-20178, the "<u>Lawsuit</u>").

19.     After engaging in litigation for nine months, on September 29, 2024, the Debtors and the other parties to the Lawsuit filed a *Joint Notice of Settlement* [Docket for Lawsuit, ECF no. 75] stating that the parties had entered into a confidential settlement on September 28, 2024 (the "<u>Settlement</u>").

**d.     Forbearance by BKCo of Alleged Defaults Under the Franchise Agreements**

20.     On February 20, 2025, BKCo declared alleged defaults under all of the Franchise Agreements.

21.     Pursuant to subsequent communications between BKCo and the Debtors, BKCo agreed to forebear multiple times through April 14, 2025 at 5:00 p.m. (prevailing Eastern Time).

### e.    The Debtors' Employees

22.    As of the Petition Date, the Debtors have approximately 773 employees (collectively, the "Employees"), 76 of whom are on salary (the "Salaried Employees") and, 697 of whom are paid hourly (the "Hourly Employees").  The Debtors' employee workforce is comprised of 748 Restaurant-level employees, who perform functions necessary to prepare and serve food, receive and stock inventory, and handle daily upkeep.  An additional 25 employees are District Managers, Directors of Operations, Vice President of Operations, administrative and executive level Employees, or Employees who perform maintenance functions. The Debtors' workforce is comprised of 76 full-time Employees and 697 are part-time Employees. Full-time Employees are those who are regularly scheduled to work at least 30 hours per week (the "Full-Time Employees"), and part-time Employees are those who are regularly scheduled to work less than 30 hours per week (the "Part-Time Employees").  None of the Employees are represented by unions or similar organizations.

### f.    Recent Financials

23.    For the fiscal year ending 2023, the Debtors had sales of $76.6 million and suffered a net operating loss of $6.3 million.  For the fiscal year ending 2024, the Debtors had sales of $67.0 million and suffered a net operating loss of $12.5 million.

24.    As of December 31, 2024, the Debtors' balance sheets reflect assets of approximately $77.9 million and liabilities of approximately $77.9 million.

### C.    THE PREPETITION CAPITAL STRUCTURE OF THE DEBTORS

25.    As of the Petition Date, the Debtors were liable for approximately $28.84 million in aggregate funded debt obligations under the Auxilior Loan Facility, Subordinated Credit Facility, Southfield Note, Union Capital Note and the 2022 Subordinated Note (each as defined

13616979-22

below). The table below summarizes estimated amounts of the Debtors' debt obligations existing as of the Petition Date.

| Debt Obligations | Estimated Approximate Amount Outstanding as of the Petition Date |
|---|---|
| **Secured Debt** | |
| Auxilior Loan Facility | $ 14.04 million |
| **Total Secured Debt** | **$ 14.04 million** |
| **Unsecured Debt** | |
| Subordinated Credit Facility | $ 13.23 million |
| Southfield Note | $    349,266.52 |
| Union Capital Note | $    349,266.52 |
| 2022 Subordinated Note | $    868,125.00 |
| Management Agreement Debt | $    3.0 million |
| General Unsecured Trade Payables | $    3.8 million |
| **Total Unsecured Debt** | **$ 21.60 million** |
| **Total Prepetition Debt** | **$ 36.64 million** |

a.      **Auxilior Loan Facility**

26.     On December 30, 2022, Consolidated Holdings, Consolidated A, and Consolidated B (collectively, the "Auxilior Borrowers") entered into that certain *Loan and Security Agreement* (no. 1003210) (as amended, restated, supplemented or otherwise modified from time to time, the "Auxilior Loan Agreement") with Auxilior Capital Partners, Inc. (the "Auxilior Lender").  Pursuant to the Auxilior Loan Agreement, the Auxilior Lender agreed to provide certain loans (collectively, the "Auxilior Loans") in the aggregate principal amount of up to $17.25 million (the "Auxilior Loan Facility") to the Auxilior Borrowers.  The Auxilior Loans are evidenced by (i) that certain *Promissory Note* (Agreement No. 1003210-001) between and among the Auxilior Borrowers and the Auxilior Lender, dated December 30, 2022, in the principal amount of $8.25 million, and (ii) that certain *Promissory Note* (Agreement No. 1003210-002) between and among the Auxilior Borrowers and the Auxilior Lender, dated

10

December 30, 2022, in the principal amount of $8.25 million (collectively, the "Auxilior Notes"). The Auxilior Loan Facility is scheduled to mature on January 15, 2029.

27.     The repayment of the Auxilior Loan Facility is secured by, among other things, security interests in and liens on substantially all of the assets of the Auxilior Borrowers pursuant to the Auxilior Loan Agreement.

28.     As of the Petition Date, the outstanding balance (including capitalized interest and accrued and unpaid/uncapitalized interest) under the Auxilior Loan Facility is approximately $14.04 million.

**b.    Subordinated Credit Facility**

29.     On June 1, 2018, Consolidated Holdings, Consolidated A, and Consolidated B (collectively, the "Subordinated Borrowers") entered into that certain *Senior Subordinated Term Loan Agreement* (as amended, restated, supplemented or otherwise modified from time to time, the "Subordinated Loan Agreement") with Southfield Mezzanine Capital LP (the "Subordinated Lender"). Pursuant to the Subordinated Loan Agreement, the Subordinated Lender agreed to provide loans (collectively, the "Subordinated Loans") in the original aggregate principal amount of $9.175 million (the "Subordinated Loan Facility") to the Subordinated Borrowers. The Subordinated Loan is evidenced by that certain *Senior Subordinated Term Note* by the Subordinated Borrowers in favor of the Subordinated Lender, dated June __, 2018, in the principal amount of $9.175 million (the "Subordinated Note"). Per a *Subordination Agreement* dated December 30, 2022 between and among the Subordinated Borrowers, the Auxilior Lender and the Subordinated Lender, the repayment of the Subordinated Credit Facility is contractually subordinated in payment to repayment in full of the Auxilior Loan Facility. The Subordinated Loan Facility is scheduled to mature on June 30, 2029.

30.     As of the Petition Date, the outstanding balance (including capitalized interest and accrued and unpaid/uncapitalized interest) under the Subordinated Credit Facility is approximately $13.23 million.

   **c.      Southfield Note**

31.     On December 30, 2022, Consolidated Holdings, Consolidated A, and Consolidated B (collectively, the "Southfield Note Borrowers") entered into that certain *Amended & Restated Promissory Note* (as amended, restated, supplemented or otherwise modified from time to time, the "Southfield Note") with the Subordinated Lender pursuant to which the Southfield Note Borrowers borrowed $301,742.19 from the Subordinated Lender. The Southfield Note matures on the earlier of June 30, 2029 and the payment in full of the Auxilior Loan Facility and the Subordinated Loan Facility.  Repayment of the Southfield Note is *pari pasu* with the Union Subordinated Note (defined herein).

32.     As of the Petition Date, the outstanding balance (including accrued and unpaid interest) under the Southfield Note is $349,266.52.

   **d.      Union Capital Note**

33.     On December 30, 2022, Consolidated Holdings, Consolidated A, and Consolidated B (collectively, the "Union Capital Note Borrowers") entered into that certain *Amended & Restated Promissory Note* (as amended, restated, supplemented or otherwise modified from time to time, the "Union Capital Note") with the Union Capital Lender pursuant to which the Union Capital Note Borrowers borrowed $301,742.19 from the Union Capital Lender.  The  Union Capital Note matures on the earlier of June 30, 2029 and the payment in full of the Auxilior Loan Facility and the Subordinated Loan Facility. Repayment of the Union Capital Note is *pari pasu* with the Southfield Note.

13616979-22

34.     As of the Petition Date, the outstanding balance (including accrued and unpaid interest) under the Union Capital Note is $349,266.52.

**e.      2022 Subordinated Note**

35.     On December 30, 2022, Consolidated Holdings, Consolidated A, and Consolidated B (collectively, the "2022 Subordinated Note Borrowers") entered into that certain *Amended & Restated Secured Subordinated Promissory Note* (as amended, restated, supplemented or otherwise modified from time to time, the "2022 Subordinated Note") with Union Capital Equity Partners II, L.P. (the "Union Capital Lender") pursuant to which the  2022 Subordinated Note Borrowers borrowed $750,000.00 from the Union Capital Lender.   Per separate subordination agreements, the repayment of the 2022 Subordinated Note is contractually subordinated in payment to repayment in full of the Auxilior Loan Facility and the Subordinated Credit Facility.  The  2022 Subordinated Note matures on June 30, 2029.

36.     As of the Petition Date, the outstanding balance (including accrued and unpaid interest) under the 2022 Subordinated Note is $868,125.00.

**f.      Management Agreement Debt**

37.     During June 2018, Consolidated Holdings, Consolidated A, Consolidated B, non-debtor Parent Consolidated Burger Holdings, LLC (collectively, the "Consolidated Company") entered into that certain *Management Consulting Agreement* (as amended, restated, supplemented or otherwise modified from time to time, the "Management Consulting Agreement") with Union Capital Associated, L.P. ("Union Capital") pursuant to which Union Capital agreed to provide management, advisory, integration and other corporate advisory services to the Consolidated Company.  Per a *Subordination Agreement* dated June __, 2018 between and among Consolidated Holdings, Consolidated A, Consolidated B, Union Capital and

the Subordinated Lender, the payment to Union Capital of amounts due to it under the Management Agreement are contractually subordinated in payment to repayment in full of the Subordinated Loan Facility.

38.     As of the Petition Date, the outstanding amount due to Union Capital Under the Management agreement totals approximately $3.0 million (the "Management Agreement Debt").

### g.    General Unsecured Trade Payables

39.     In the ordinary course, the Debtors incur trade debt with certain landlords, vendors, suppliers, and taxing authorities in connection with the operation of their business. As of the Petition Date, the Debtors' outstanding trade payables totaled approximately $3.8 million in the aggregate.

### D.    EVENTS LEADING TO THE FILING OF THE CHAPTER 11 CASES

40.     The Debtors have faced significant hurdles resulting from industry headwinds which, combined with the Debtors' highly leveraged balance sheet, have significantly challenged the Debtors' business and depleted their liquidity. Over the past several years, and particularly as a result of the COVID-19 pandemic, the Debtors' business suffered significantly from loss of foot traffic, resulting in declining revenue without proportionate decreases in rental obligations, debt service, and other liabilities. Additionally, recent increases in costs of shipping and food, decreased availability of labor, and inflation generally have exacerbated the Debtors' cash flow issues. As a result, although certain of the Restaurants have remained profitable, others have been operating at a loss, resulting in the Debtors' inability to meet their obligations and achieve the financial metrics required under various agreements. As explained below in greater detail, the Debtors marketed their assets for more than seven months prior to the Petition Date, with no executable transaction materializing.

14

41. The Company's substantial debt and interest burden has been difficult to sustain given the industry, regulatory, and expense headwinds described above. The carrying costs of the Debtors' funded debt is significant and, when taken together with the declining margins and increased expenses resulting from the market changes described above, such debt load has become unsustainable, and the Company's liquidity has deteriorated.

42. As of the Petition Date, the Debtors have approximately $179,000.00 in unrestricted cash and cash equivalents which, without postpetition funding, will not be sufficient to meet the Debtors' obligations to fund their fixed costs. The Debtors require access to $1.6 million in the form of debtor-in-possession financing, in addition to the use of cash collateral, to operate the Debtors during a sale process in the Chapter 11 Cases. The Auxilior Lender is prepared to fund these Chapter 11 Cases to enable the Debtors to undertake a post-petition sale process with the goal of consummating a sale of substantially all of the Debtors' assets to one or more buyers.

43. On July 25, 2024, Debtor Consolidated Holdings and certain non-debtor entities retained Peak Franchise Capital LLC ("Peak"), to, among other things, market the assets of the Company and certain non-debtor entities for sale (the "Marketing Process"). The Marketing Process spanned more than seven months during 2024 and 2025, and included outreach to both prospective strategic and financial acquirors in an effort to market and sell the Debtors' assets. Specifically, Peak contacted 235 potential acquirors, and the Debtors executed confidentiality agreements with 32 of them, during the Marketing Process. Peak assisted the Company and the non-debtor entities in creating a confidential information memorandum which it disseminated to the 32 potential acquirors. Peak held a multitude of calls with most of the potential acquirors

from August 2024, through March 2025, and facilitated the Debtors' response to numerous diligence requests.

44.    No transaction was achieved during the Marketing Process for the Company or the assets of the non-debtor entities.

## PART II
## DEBTORS' OBJECTIVES IN THESE CHAPTER 11 CASES

45.    The principal objective of these Chapter 11 Cases is to engage in a postpetition sale and marketing process for substantially all of the Debtors' assets and to secure approval of and consummate a going concern sale of such assets, which will ensure continuity of business operations, while not foreclosing an alternative transaction that might maximize the value of the Debtors' estates, including a reorganization through a recapitalization.  The Debtors also seek to continue to provide employment to their employees and to provide an enterprise which will be a trading partner to many of their contract counter-parties and vendors, and of course to maximize the value of their enterprise for their creditors.

46.    To sustain the Debtors' operations through the chapter 11 process, the Auxilior Lender (the "DIP Lender") has agreed to provide debtor-in-possession financing (as more fully described below), subject to the rights and protections proposed in connection therewith.  As reflected in the Debtors' cash flow forecast, the Debtors' business can remain operational as a going concern as long as the Debtors have access to the debtor-in-possession financing.  Absent the DIP Lender's agreement to provide debtor-in-possession financing in conjunction with the Auxilior Lender's consent to use cash collateral to fund the Chapter 11 Cases and provide working capital needs pending a sale, the Debtors would have been forced to cease all operations, lay off their employees, and terminate all of their operations.  Without the relief requested in the First Day Filings, immediate liquidation would be certain.

13616979-22

47.     The Court's approval of the relief requested in the First Day Filings will permit the Debtors to preserve and maximize their enterprise value during the proposed sale process for the benefit of their employees, creditors, vendors, and other parties in interest.  The Debtors' immediate objective is to stabilize their operations, continue to operate, preserve liquidity, minimize any adverse effects that these Chapter 11 Cases might otherwise have on their estates by obtaining the relief requested in the First Day Filings, and to work with interested parties to proceed with a sale of their business for the benefit of the above-mentioned stakeholders.

48.     For these reasons, and the additional reasons discussed in the First Day Filings which are incorporated herein by reference, I respectfully submit that the various relief requested in the First Day Filings is in the best interest of the Debtors and their estates and should be approved by this Court.

## PART III
## FACTS SUPPORTING RELIEF SOUGHT IN FIRST DAY FILINGS

49.     Concurrently with the filing of these Chapter 11 Cases, the Debtors are filing certain First Day Filings.  The Debtors respectfully request that the Court conduct a hearing as soon as practicable after the commencement of the Chapter 11 Cases (the "First Day Hearing") to consider the First Day Filings.  For the avoidance of doubt, the Debtors seek authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in those of the First Day Filings for which such authority is sought.  The First Filings include the following:[2]

      a.     Debtors' *Ex Parte* Motion for Joint Administration (the "Joint Administration Motion").

      b.     Debtors' Emergency Application for Entry of an Order Authorizing the Retention of Development Specialists, Inc. to Provide, on an Interim and Final Basis and Effective as of the Petition Date, the Services of Joseph J.

---

[2] Any defined terms used but not defined in this section shall have the meaning ascribed to them in the respective First Day Filing.

Luzinski, as Chief Restructuring Officer, and Additional Personnel for the Debtors (the "<u>CRO Retention Application</u>").

c.     Debtors' Emergency Application for Entry of an Order Authorizing Debtors to Employ and Retain Omni Agent Solutions, Inc. as Claims, Noticing and Solicitation Agent, Effective as of the Petition Date (the "<u>Claims Agent Retention Application</u>").

d.     Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to File (A) A Consolidated Creditor Matrix and (B) A Consolidated List of the Top Thirty Unsecured Creditors; (II) Authorizing the Debtors to Redact Certain Personal Identification Information for Individual Creditors and Parties in Interest; and (III) Granting Related Relief (the "<u>Creditor List Motion</u>").

e.     Debtors' *Ex Parte* Motion for Authorization to File Consolidated Chapter 11 Case Management Summary (the "<u>Consolidated Case Management Motion</u>").

f.     Expedited Motion (I) Approving the Form of, and Procedures for, Filing Proofs of Claim, (II) Approving the Form and Manner of Notice of the Commencement of the Chapter 11 Bankruptcy Cases (a/k/a the Bar Date Notice), (III) Establishing Bar Dates for Filing Proofs of Claim, and (IV) Granting Related Relief (the "<u>Bar Date Motion</u>").

g.     Debtors' Emergency Motion to Limit Notice (the "<u>Limit Notice Motion</u>").

h.     Debtors' Emergency Motion for an Order (I) Authorizing Debtors to Pay Certain Prepetition Employee Obligations and Prepetition Withholding Obligations, (II) Authorizing the Debtors to Maintain Employee Benefit Programs, (III) Authorizing Banks to Honor Related Prepetition Transfers, and (IV) Granting Related Relief (the "<u>Employee Wages Motion</u>").

i.     Debtors' Emergency Motion for an Order Authorizing the Debtors to (I) Continue Administering Insurance Policies; (II) Continue Paying Certain Brokerage Fees; and (III) Satisfy Other Obligations Related Thereto in the Ordinary Course of Business (the "<u>Insurance Motion</u>").

j.     Debtors' Emergency Motion for an Order (I) Authorizing Payment of Certain Taxes and Fees and (II) Granting Related Relief (the "<u>Taxes Motion</u>").

k.     Debtors' Emergency Motion for Entry of an Order Authorizing (I) Payment of Prepetition Claims of Critical Vendors; (II) Payment of Prepetition Claims Arising Under the Perishable Agricultural Commodities Act and the Packers and Stockyards Act, Including

18

Continuing to Provide Certain PACA/PASA Vendors Authority to Access Disbursement Account Under Current Procedures Regarding Payment of Invoices; (III) Debtors to Enter into Vendor Agreements; and (IV) Financial Institutions to Honor and Process Related Checks and Transfers (the "Critical Vendor-PACA/PASA Motion").

l.      Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Continue to (I) Maintain Their Cash Management System, (II) Honor Certain Prepetition and Post-Petition Obligations Related Thereto, (III) Use Existing Business Forms, and (IV) Perform Intercompany Transactions, and (B) Granting Related Relief (the "Cash Management Motion").

m.      Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, Granting of Senior Postpetition Security Interests and Allowance of Superpriority Administration Expense Status Pursuant to Sections 364(c) and 365(d) of the Bankruptcy Code, (II) Authorizing Postpetition Use of Cash Collateral, (III) Approving DIP Loan Term Sheet, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief (the "DIP Financing Motion").

50.      I have reviewed each of the First Day Filings (including, but not limited to, the exhibits, amendments, schedules and proposed orders attached thereto) and, to the best of my knowledge, I believe that the facts set forth therein are true and correct.  Moreover, I believe that the relief sought in each of the First Day Filings: (a) is essential to enable the Debtors to enter into, and to sustain operations in, chapter 11 with minimal disruption to operations or loss of productivity or value; (b) constitutes a critical element in achieving a successful asset sale of the Debtors, or other transaction (*e.g.*, recapitalization) to maximize the value of the Debtors' estates; and (c) is in the best interests of the Debtors' estates and creditors' and stakeholders' interests.  Further, it is my belief that the relief sought in the First Day Filings is narrowly tailored and necessary to achieve the goals of these Chapter 11 Cases, including the ability of the Debtors to preserve and to maximize value of, as well as to avoid immediate and irreparable

13616979-22

harm to, the Debtors' estates.  The facts set forth in each First Day Filing are incorporated herein by reference.[3]

51.    I have consulted with the Debtors' advisors regarding the relief requested in the First Day Filings. To the best of my knowledge and belief, the factual statements contained in each of the First Day Filings are true and accurate, and each such factual statement is incorporated herein by reference.

52.    I believe that the failure to grant the relief requested in any of the First Day Filings may result in immediate and irreparable harm to the Debtors, their Business, and their estates. Accordingly, for the reasons set forth herein and in each respective First Day Filing, I respectfully request that the Court should grant the relief requested in each of the First Day Filing.

## PART IV
## CONCLUSION

53.    For the reasons described herein and in the First Day Filings which are incorporated herein by reference, I believe that the prospect for achieving the Debtors' objectives for their Chapter 11 Cases and the preservation of their enterprise for the benefit of their other stakeholders will be substantially enhanced if the Court grants the relief requested in each of the First Day Filings.

---

[3]    On or shortly after the Petition Date, the Debtors also have filed, or will file, the *Debtors' Application for Approval of the Employment of Jordi Guso and the Law Firm of Berger Singerman LLP as Counsel to the Debtors, Effective as of the Petition Date* (the "BSLLP Retention Application") and the *Debtors' Application for Entry of an Order (I)Authorizing the Retention of Peak Franchise Capital, LLC as Investment Banker to the Debtors, Effective as of the Petition Date, (II) Waiving Certain Time-Keeping Requirements, and (III) Granting Related Relief* (the "Peak Retention Application").  These two retention applications will not be scheduled to be considered by the Court at the first-day hearing in these Chapter 11 Cases.  For the very same reasons expressed in support of the First Day Filings, I believe the Court should approve both the BSLLP Retention Application and the Peak Retention Application when each is considered for approval by the Court.

13616979-22

### 28 U.S.C. § 1746 Declaration

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed this <u>14th</u> day of April, 2025 in Miami, Florida.

*/s/ Joseph J. Luzinski*
Joseph J. Luzinski
Chief Restructuring Officer

13616979-22

**Exhibit A**

**Corporate Structure**

